This case will be 0750525097, Sacramento Municipal Utility District v. United States, Mr. Lohre. Thank you, your honor. Good morning. My name is Alan Lohre. Not to be confused with others. Exactly. I like the spelling of your first name, your honor. This court should reverse the trial court's award in this case because in awarding damages after May 15, 1997, the court failed to examine the actions that SMUD would have taken and the cost that SMUD would have incurred had DOE performed this contract under its contractual obligations. The effect of that, your honor, that error, is threefold. One, the court made a finding based upon the testimony of a witness saying that had SMUD known that DOE would have performed, they would have performed a completely different outcome of their analysis in May of 1997 to continue with their dry storage project. The problem is that that analysis was based on an outdate, which is the date that SMUD would have had all of its fuel removed. That is based upon an outdate that relies upon the so-called 3000 rate that we've been discussing today. To be clear, just one factual distinction about this case is that in this case SMUD is a utility that is no longer operating. So unlike, for instance, the PG&E plants, SMUD has put all of its fuel, shut down its plant, put all of its fuel into storage and is waiting for a day that it no longer is in the nuclear fuel business, that is, the last of its fuel is taken. Therefore, this so-called outdate is critical to determine what their decisions will be going forward. So one, the court erred because it on one hand said we are relying upon the testimony of this witness who in turn relies upon the 3000 rate. And then at the same time the court said on the record before it, it could not determine a rate of acceptance. Right there, Your Honors, that is an error because the court did not, as this court requires in many cases, including Bluebonnet, which was discussed earlier, and as recently and as relevantly as Indiana Initiative, this court did not, the trial court did not perform a so-called but-for world analysis. That is, would these costs have been incurred irrespective of the breach? The second area where the court… Didn't the judge, though, kind of implicitly adopt Sacramento's expert testimony and therefore lean towards the 3000 MTU rate? No, Your Honor. The court expressly said that on the record before it, it could not make a decision on a rate. It did say that. It declined to accept the rate, but it implicitly accepted that rate when adopting that expert testimony, didn't it? No, Your Honor. We would say that it did not. It did not. We cannot say it implicitly adopted. We think that it erred by making those contradictory rulings at best, but there was nothing in the record or in the court's opinion to suggest that it was accepting the rate put forth by… Particularly when the trial court said on the record before it, it could make no finding with respect to rate. The second area where the court… Where the general error, that is, the violation of the blue bonnet test, if you will, or the Indiana-Michigan test. The second area, the consequence of the error, is that the court accepted testimony from both the contemporaneously prepared testimony by the utility employees and also expert testimony by the government expert regarding the so-called payback analysis. And this is simply an analysis that SMUD performed while it was going forward and deciding to continue to pursue dry storage. The court accepted that testimony but did not put it in the context of a world without a breach. In other words, there is testimony in the record, unrefuted testimony, that SMUD made the decision that as of 1997 it would cost $20 million to complete its dry storage facility. And that once the fuel was put into dry storage, there would be a savings between wet storage and dry storage of between $10 and $12 million a year. The bottom line on that analysis, Your Honor, is that SMUD's facility, its dry storage facility, would have paid for itself years before this so-called outdate, even if you assume the best-case scenario for SMUD. In other words, SMUD would be reaping the benefit as of 2001, 1999, 2000, in that time period, of a $10 to $12 million savings per year, and even in the best-case scenario, would not have the last of its fuel removed until 2006. So a relatively small investment. And to be clear, and our expert testified about this, this is not $20 million starting in 1999. These are $20 million, the bulk of which had already been invested. In other words, there was a relatively small going-forward cost to a big payoff. So even assuming, Judge Rader, as you said, that the Court was implicitly accepting the so-called $3,000 rate, the Court did not review the payback analysis in light of a world without a breach. That, in and of itself, is error. The third area where the Court committed error is that when the Court calculated the damages, it did not account for costs that would have been incurred even if DOE had performed it. In other words, let's assume for the moment that the Court's determination that SMUD would have had it known that DOE was going to perform it. SMUD would have said— Is the government really trying to have it both ways here, Mr. Loray? On the one hand, you want a but-for analysis, and yet you want to rely on SMUD's real-world analysis to say that they would have saved money. No, Your Honor, because as this Court requires to make a damages calculation, as we've heard the parties recognize, both parties recognize, to make a damages calculation analysis, the Court needs to say what would have happened in the world without a breach. And to do that, we know that there was a payback analysis. So the question really is what SMUD would have done in the but-for world. That's exactly right, Your Honor, and there's no reason on this record to think that SMUD— So we don't need to rely on your real-world arguments that you were giving us a moment ago? Well, no, Your Honor, because there's no reason to think on this record that SMUD would not have performed a payback analysis in the but-for world. As I said earlier, SMUD was in the business of getting out of the business of nuclear fuel, of being a nuclear utility. And as the evidence before the trial court showed, there were a number of factors that went into getting the cost associated with that facility down. One of them was that he spent nuclear fuel. And so even if DOE had been performing, there's no question on this record or there's no suggestion that SMUD would not have been performing a payback analysis. In other words, we're investing into this system. How long will it be before— SMUD presented a great deal of evidence with a great deal of different analyses. You're emphasizing one that you like best, but there certainly is a lot more on this record, isn't there? There is certainly more evidence in this record, Your Honor, but there was no evidence in this record to suggest that in a world without a breach, SMUD would not have been performing a payback analysis. We took no quarrel with SMUD on that. SMUD was making a business decision as to whether or not to continue with the dry storage project. Now, our position is that SMUD would have still been making a business decision with respect to dry storage even if DOE had been performing. The last— Well, they made the business decision to stop until they realized they weren't going to be able to get rid of it. I'm sorry? It was a decision to start again in light of the government's— Well, to be clear, SMUD made a decision back in 1990 to pursue the dry storage facility, and SMUD and the trial court determined that that decision was made irrespective of the breach. In fact, just like this court held in Indiana, Michigan. The question then came as to, as SMUD progressed through the years, they had trouble with their dry storage facility, largely because it was a first-of-its-kind facility, or one of the first in the nation. They continually reassessed whether they should continue to go forward. So there wasn't a time that SMUD stopped and said, okay, in light of the breach, we're going to go forward now and start up again. They were continuing to work on this project. It was just a question of, as they went along, the testimony showed that there were internal decisions. Should we continue? Should we throw good money after bad? And our position in respect to the payback analysis is that whether or not— Once again, taking the language from the Indiana, Michigan decision, irrespective of the breach, SMUD would have been making those decisions. When the trial court looked at our expert testimony in this regard, the trial court said, well, your expert provided an opinion, but that opinion was performed using a but-for analysis. But the Court of Federal Claims made a finding that in May 1987, under the severe conditions of militating against going forward, they went forward anyway because of the impending breach. That's a finding. How do we set that aside? Because, Your Honor, it is a finding. It's a factual finding. But it was not viewed in the lens, if you will, or viewed in the context of a world without a breach. When this court made its decision about whether or not the Indiana, Michigan would have rewritten and said, irrespective of the breach, the court, this court, was removing the breach from the equation and saying, what would they have done? In that case, they would have rewritten, even if DOE had not breached. The trial court, in this case, did not do that. The evidence was, the court did in fact make a factual finding, but that factual finding was not viewed through the lens, if you will, of a world without a breach. And that is what this court requires a plaintiff seeking expectation damages to do. Finally, Your Honor, the last area where the court's error, the last area that was impacted, was this idea of so-called termination costs. That is, let's assume for the moment that SMUG did decide to continue to pursue dry storage because of the breach. What the trial court didn't do was to say, okay, what is the consequence, the monetary consequence of that? There is evidence in the record that shows it would have cost up to $5.5 million for SMUG to stop the process of dry storage, terminate all those contracts, work up its wet pool, go back and fix leaks and make it a more robust wet pool. That cost of up to $5.5 million, the trial court didn't review. The trial court said there's a large breach under the substantial causal factor test. I don't need to look at a world without a breach and stop the analysis. What the trial court should have done, even if it found that, even if it properly found that the decision to pursue dry storage after 1997, May 1997, was caused by the breach, the trial court should have considered those costs. Because again, that's what this court requires. No further questions? We request that the court reverse the trial court's decision in the record. Thank you. Mr. McDonald? Thank you, Your Honor. Tim McDonald on behalf of SMUG. Judge Rader, your question with respect to the factual findings of the district court, the court below, and I was reminded listening to Mr. Loray's argument that I'd heard these arguments before during the several weeks of trial with various dozens of witnesses. Thousands of pages of documents, thousands of pages of deposition designations, that the trial court's findings were based on the facts of this case. And the government's quarrels and the government's issues on appeal are fact issues. And they were viewed for clear error. And there's extensive evidence that the trial court in this case correctly analyzed the facts and certainly no evidence that it was clearly erroneous. The trial court held SMUG to its burden of proving that the breach caused SMUG to act after May of 1997. Held SMUG to its burden of showing reasonable foreseeability and reasonable certainty in damages. With respect to the three decisions we've heard about this morning, there's one consistency between them. And that is that the shutdown utilities, all three shutdown utilities in Yankee, the trial court made the determination that those utilities, had the government been performing, would not have gone down the frolic and the detour and the pain and the heartache of developing their own on-site dry storage facility. With all the attendant costs, with all the attendant risks, they wouldn't have done that. That was the factual finding in Yankee. In PG&E, I'll note Mr. Loray said they were operating utilities. That's partially true. In PG&E, there were two different utilities, two reactors that PG&E owned. The Diablo Canyon reactor was operating. The Humboldt Bay was shut down. It's notable that Judge Hewitt in the PG&E case found that even the shutdown utility in PG&E would not have gone down the road of developing its own on-site dry storage facility. And that's even under the government's rate. Because Judge Hewitt realized that going down the path of developing your own on-site dry storage facility is an endeavor that utilities would not have wanted in the non-breach world. Isn't the right call here to remand and tell the court to consider the but-for world with, of course, the facts of the real world as they transpired, given the rate that this court would presumably, pursuant to these appeals, promulgate? Isn't that what really ought to happen here? I don't think so, Your Honor, because the court did consider the non-breach world. And with respect to the acceptance rate, the court ensured that SMUD not be put in a better position. But the court didn't get to the rate question. Aren't we going to have to go back and tell them, here's the rate. Implement it. I don't think so, Your Honor, because under any rate, the court ensured that the government not be damaged. In other words, what the court found is that under the government's rate, under SMUD's rate, under any rate, SMUD would continue holding fuel in the non-breach world, and it provided the government an offset of $4.2 million for that basis. So the trial court made the necessary factual finding that under any rate, SMUD would continue holding fuel in the non-breach world. That's the necessary predicate. And it ensured by giving the government an offset to SMUD's actually incurred damages. SMUD had a claim of almost $80 million. The trial court whittled that down by nearly $40 million. And one of the ways in which it took the rate question out of play, Judge Rader, is by saying that under any rate, SMUD, you would still be holding fuel through the entire damage period. And because of that, we're going to give the government an offset. So that's under your rate, SMUD. That's under the government's rate. So in this case, what the government told the trial court, and this is on page 2104 of the appendix, they said, because SMUD is not seeking future damages, a determination of the acceptance rate will have little, if any, effect on SMUD's damages. They told the trial court again on page 1999 and page 2000 of the appendix, a determination of rate is unnecessary in this case. So I think the government made clear to the trial court that because SMUD was shut down, it did not have to do anything with its fuel, just like the shutdown utilities in Yankee, just like the shutdown utility in PG&E. It simply would have left its fuel in the wet pool and waited for the government to perform. But doesn't there need to be a little consistency here amongst these cases? We've got more behind them, too. That's right, Your Honor. Isn't the one service we might be able to perform here is to get the Court of Federal Claims judges at least on the same page? Well, I think obviously based on the Yankee case and the PG&E case, this court will have to make a decision on a reasonable rate. And I think that will inform all the following cases. But with respect to this case, the trial court ultimately used the fact of rate against SMUD and awarded the government a $4.2 million offset. So it ensured that however this court comes back on rate, she wouldn't have to hear that portion of the case again, Your Honor. With respect to the issues on SMUD's cross appeal, the trial court imposed a whole variety of non-breach world offsets. And most of those we don't challenge. But she did analyze the non-breach world. She imposed offsets for upgrades to the spent fuel bill, which she said would have been made had the government performed. Upgrades to the gantry crane, fuel inspections, carryover contracts, on-site job testing. These were all offsets that the trial court said, SMUD, you would have done these, or at least it's likely you would have done these, had the government performed. And so SMUD challenges only three of those offsets. And that's for the on-site SMUD's internal labor. It's for the dual-purpose components of the system. And it's for the non-fuel components. With respect to the non-fuel components, the government brief concedes the trial court's analysis on non-fuel components is wrong. That non-fuel components are covered by the contract. SMUD was legally entitled under the contract to store those components with the fuel. The government didn't even seek an offset below for the non-fuel components. So that's a $1.7 million offset that we think needs to be reversed. With respect to SMUD's internal labor, the trial court here disallowed, refused to award SMUD $9.5 million of its internal labor. And in this respect, the SMUD decision stands alone. The Yankee utilities received their internal labor and didn't obtain an offset. The PG&E utilities received the internal labor that was devoted to mitigating the breach. And here the trial court's analysis focused on the wrong question, which is when a utility is forced to utilize its own labor, it has two choices. It can go out and hire an outside contractor or it can use its staff who are more knowledgeable, understand the systems in play. And that's what SMUD did. And if SMUD had gone out and hired outside contractors, I have no doubt that Mr. Lowry would have stood up and said SMUD failed to mitigate because it used more expensive labor. It could have used its own people. And SMUD's the only decision where it hasn't received its own internal labor. Important to note that there's absolutely no suggestion, certainly no finding below, that SMUD – that its labor was unnecessary or inappropriate. Indeed, just the contrary. The trial court found that SMUD had sufficient internal controls so that all of its time and all the transactions were timely recorded and accurately reported. So SMUD didn't – it only ceased the specific hours that it billed to this project. And that's the tune of $9.5 million. With respect to the dual-purpose offset, here again the SMUD court stands alone. All the utilities that are pursuing their own on-site dry storage systems have gone the same route SMUD has. The Yankee utilities developed dual-purpose systems. They didn't get an offset. The PG&E utilities, the dual-purpose system, again, no offset. All the cases that have been decided since SMUD – Southern Nuclear, Northern States, System Fuels – dual-purpose system they pursued and no offset. In this case, Judge Braden concluded that the precise technology had to be reasonably foreseeable at the time of contract formation in 1983. And we think that's the wrong legal standard, and we think it's wrong on the facts. The legal standard is whether or not the type of loss is reasonably foreseeable. And every other court has held that at the time of contract formation, if the government were going to breach, it's reasonably foreseeable that a utility would have to develop its own alternative system of storage. So it's not the precise technology that has to be foreseeable. And indeed, I think our brief makes clear that, in fact, in this case, it was reasonably foreseeable that utilities would develop just the technology that has emerged. DOE's encouraged it. The NRC's encouraged it. And that's what SMUD acted just like all the other utilities have done in developing a dual-purpose system. And that was a $2.2 million offset. So we ask that those three offsets for the internal labor, the transportable components, and the non-fuel components be reversed. If there are no questions, I'd like to resume my time. All right. Thank you. Mr. Lurie? Thank you, Your Honor. A few brief points. One, Mr. McDonald said that the court did perform an analysis and said that SMUD would have held on to its fuel and therefore did offset – assigned an offset to the $2.4 million. But what the court didn't do, again, Your Honors, is to make the determination as to whether or not any of the costs would have been incurred irrespective of the breach. In other words, not a question of what is offset, but a question of whether or not SMUD was entitled to any of these costs that are associated with the continuation of the pursuit of its price coverage project. I would add to that that Mr. McDonald did a very good job of pointing out that the court – and again, this goes to your question, Judge Rader, about whether or not the court implicitly accepted the $3,000. The court clearly did not implicitly or explicitly accept the $3,000. Do you want to say anything about the cross appeal? That's why you're back. Thank you, Your Honor. With respect to the cross appeal, it's very simple. With respect to internal labor, this is simply a challenge of fact finding. There is no clear error here. The court did perform its proper analysis, and it said on the record at page – They would have been paid anyway. They would have been paid anyway. Exactly, Your Honor. That's the whole analysis. And there was no evidence that SMUD put forth to say that they wouldn't have been paid, that they wouldn't have incurred these exact costs. With respect to the non-fuel components, the court – we do recognize that non-fuel components are to be accepted under the standard contract. But again, the court did not perform an analysis to say whether or not those costs would have been incurred without the breach. It's as simple as that. Finally, with respect to dual purpose, the dual purpose foreseeability issue is akin to the finding in Indiana, Michigan with respect to private fuel storage. In Indiana, Michigan, the court said it was too speculative to determine that that was foreseeable at the time of the contract award. At the time the contract was awarded in this case, the parties – the contract itself, and still to this day, require that DOE show up with the cask to take the cask away from the utility. That is inconsistent with the notion of a utility then buying a dual cask system. In other words, how could it be foreseeable that if I breach the contract and I say I'm going to show up with a trash can to your house, how could it be foreseeable that if I breach, you wouldn't have to buy a trash can in a truck? It's as simple as that. All right. Thank you. Thank you. Mr. McConnell, do you have anything further? Just briefly on the labor point, the question of whether SMUD would have retained these employees misses the mark. The question is whether, by virtue of requiring 256 employees to spend seven years mitigating a breach, SMUD was deprived of their work on other projects. And that's a point that's been recognized by all the other cases. This is a true loss and a true cost on a mitigating party. And if the trial court's decision stands, mitigating parties will be put in terrible positions because they can either utilize their own employees and risk being denied recovery unless they somehow use more. But the factual finding was that Sacramento wasn't performing other things. We think that's a clearly erroneous finding, Your Honor. It's inconsistent with the court's finding that SMUD was decommissioning at its site. In other words, at its site, what was happening is they're shrinking the facility. They're dismantling things. And it's why, of these 256 employees, 240 of them spent less than half time on the dry storage project. That was the basis of the trial court's offset. So they spent more than 50 percent of their time over a 12-year period. That was the basis of the court's application of the 50 percent rule. These employees spent more than half their time doing other things at the site, primarily decommissioning. So the trial court's conclusion that had they not been mitigating, they would have been idle, they would have been sitting around doing nothing, is inconsistent with the fact that there's decommissioning going on at the site. And it's also inconsistent with the evidence that showed that during the 12-year period that SMUD started developing its dry storage system, SMUD reduced its workforce from 400 to 80. It was an 80 percent reduction in staff during that period. So the notion that people were sitting around idle if they weren't working on mitigation activities is inconsistent with the evidence that was put forward below. A final point on the rate, Your Honor. The trial court recognized that it's in a world where DOE is performing. And we heard this morning a lot of talk about taking care of the backlog. Is that part of your cross-appeal? It's not, Your Honor. If there are no further questions, I'll finish. All right. Thank you very much. Case is submitted. All rise. The honorable court is adjourned until tomorrow morning at 10 o'clock.